# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| BILLY JOE SCHLEIGER, | : | Case No. 3:18-cv-00016 |
| --- | --- | --- |
| Plaintiff, | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I. Introduction

Plaintiff Billy Joe Schleiger was severely injured in a motor-vehicle accident in 2008. He underwent surgery to repair his fractured left ankle and his left-leg injuries. The surgery involved placing metal plates in his left ankle and metal rods and plates in his right leg. He eventually recovered enough to believe he could start working again, so he took a new job as a truck driver for a delivery service. Yet, he continued to suffer from pain and swelling in his lower legs. This is unsurprising given the seriousness of his ankle and leg injuries and the surgically implanted hardware attached to his bones with screws.

Plaintiff lasted as a truck driver until June 2012 when the swelling and constant pain in his lower extremities became too severe. Two years later, he applied for

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Disability Insurance Income and Supplemental Security Income asserting that he became disabled on June 1, 2012.

The Social Security Administration denied his applications based mainly on the decision of Social Security Administrative Law Judge (ALJ) Mark Hockensmith that Plaintiff was not under one or more disabilities. Plaintiff presently contends that ALJ Hockensmith failed to reasonably evaluate his work abilities and credibility. He asks the Court to overturn ALJ Hockensmith's decision and award him benefits at least from the date he turned age fifty "as the evidence regarding his profound lower extremity problems overwhelmingly supports a restriction to sedentary work." (Doc. #7, *PageID* #749).

The Commissioner contends that a remand is unwarranted because the ALJ properly relied on the state agency medical consultants' opinions, and substantial evidence supports his assessment of Plaintiff's work abilities and credibility.

**II.    Background**

Plaintiff was forty-seven years old on his asserted disability onset date of June 1, 2012. This placed him in the category of a "younger" person under social security law. In 2014, he aged into the category of a person "closely approaching advanced age." He graduated from high school and worked not only as a truck driver but also as a maintenance worker in a saw mill for ten years plus other work.

Before issuing his non-disability decision, ALJ Hockensmith held a hearing during which Plaintiff testified. He explained that when he first began to work as a truck driver, things were "okay." His pain eventually increased to the point he couldn't sleep and

didn't feel safe driving. (Doc. #6, *PageID* #71).

In June 2013, Plaintiff underwent surgery to address his ongoing problems with the surgical implants. He testified that at the time of the ALJ's hearing (August 2016),

> the knee doesn't function properly and will give at times and where my femur bone … broke and come out through the skin, it ripped all the muscle and all that stuff and I've got scar tissue in there that just—the older I get, the more painful it gets … every day.

*Id*. at 74.

Plaintiff's swelling and pain allow him to sit for only 15 minutes at a time. He then needs to stand, walk around for a minute then sit in a different chair or start using a heating pad. Cold and rainy days make him feel worse. *Id*. at 75.

Plaintiff tried to walk around as a physical therapist suggested but when he finished walking around, "then it was bad." *Id*. He would take 6 to 8 Tylenol each day. Although he could mow the lawn in the past, he could no longer do so. The only yardwork he did was to "use the weed-eater occasionally for a little bit." *Id*. He had tried to use a cane but it did not seem to help. He noted, "I'm never up that long of periods of time." *Id*. at 77.

Plaintiff still felt stabbing pain in his left ankle but not like the pain he had experienced before a surgeon removed the hardware from his left ankle in 2013. He testified, "the screws had broke[n] and the plate was moving around and they couldn't remove it all, since it was going through the bone and they said it would be a lot more extensive to take it all out, to where I'd be a lot better off, if they just took the stuff that was just floating around inside my ankle." *Id*.

The most comfortable position for Plaintiff is lying on his left side. *Id*. at 77-78. He lies back in a recliner 18 hours a day, mostly watching TV. *Id*. at 79, 82. He testified, "the recliner is better than sitting up because I don't have the pressure on the backs of my legs, like I do in this chair.[2]" *Id*. at 82 (footnote added). When he stands for a long period of time, his legs swell very noticeably. It helps him a little bit to take a warm bath. *Id*. at 80. If he stands for longer than he should, he'll "start hurting real bad." *Id*. He experiences a really bad day four to five days a week. Taking Vicodin twice a day, as it is prescribed for him, makes his mind "fuzzy." *Id.* at 82. When this happened, he would rest in the recliner and watch TV. His prescription medications also include Gabapentin and the occasional Tylenol.

In addition to Plaintiff's testimony and medical evidence, ALJ Hockensmith reviewed the opinions provided by three physicians: B.T. Onamusi, M.D.; Rannie Amiri, M.D.; and Leon D. Hughes, M.D.

In January 2015, Dr. Onamusi met and evaluated Plaintiff for the Ohio Department of Disability Determinations (DDD). (Doc. #6, *PageID* #s 457-64). Based on his one-time evaluation, Dr. Onamusi opined that Plaintiff could function at the "sedentary to light physical demand level as defined in the Dictionary of Occupational Titles." (Doc. #6, *PageID* #463).

Two months later, Dr. Amiri reviewed Plaintiff's medical records for the DDD. He concluded that Plaintiff could perform a limited range of light work by occasionally lifting and carrying 20 pounds; frequently lifting and carrying 10 pounds; standing and

---

[2] Plaintiff sat in a chair as he testified.

walking about 6 hours in an 8-hour workday; sitting about 6 hours in an 8-hour workday (with normal breaks); and unlimited pushing and pulling (including operation of foot and hand controls. *Id*. at 100. Dr. Amiri further opined that Plaintiff could frequently climb ramps or stairs; occasionally climb ladders, ropers, or scaffolds; frequently kneel or crouch (bending at his knees); and occasionally crawl. *Id*. at 101. Dr. Amiri also thought about Dr. Onamusi's opinions and gave them "great weight as the report appear[s] to be an accurate reflection of the [claimant's] limitations." *Id*. at 100.

In May 2015, Dr. Hughes reviewed the record and offered the same opinions as Dr. Amiri about Plaintiff's functional limitations. *Id*. at 127-28. Dr. Hughes also placed "other weight" on Dr. Onamusi's opinion by finding it "quite vague" without supporting explanation. *Id*. at 128. Dr. Hughes' "quite vague" finding is a stone thrown from a glass house: it, itself, is quite vague because it is unsupported by any explanation or further comment.

### III. "Disability" and The ALJ's Decision

To be eligible for Disability Insurance Benefits or Supplemental Security Income a claimant must be under a "disability" as the term is defined by the Social Security Act. *See* 42 U.S.C. §§ 423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same for both benefit programs. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.

*See id.* at 469-70.

As noted previously, it fell to ALJ Hockensmith to evaluate the evidence connected to Plaintiff's applications. He did so by conducting the 5-step sequential evaluation mandated by Social Security regulations. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). He ultimately concluded that Plaintiff was not under a benefits-qualifying disability based on the following main findings: <u>Step 2</u>: Plaintiff's severe impairments include "residuals of 2008 right leg and left ankle repair surgeries and subsequent 2013 hardware removal; peripheral neuropathy." (Doc. #6, *PageID* at 42). <u>Step 3</u>: His impairments, alone or together, did not automatically qualify him for benefits. *Id*. at 44-45.

<u>Step 4</u>: The most Plaintiff could do despite his impairments—his residual functional capacity *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)—was a light level of work with 5 limitations: "(1) no climbing of ladders, ropes, or scaffolds; (2) frequent climbing of ramps or stairs; (3) frequent kneeling and crouching; (4) occasional crawling; and (5) occasional pushing/pulling with the right lower extremities." (Doc. #6, *PageID* #45). Given these limited abilities, Plaintiff could no longer perform his past work as a truck driver or maintenance worker. *Id*.

<u>Step 5</u>: Considering the combination of Plaintiff's residual functional capacity, high-school education, work experience, and age, he could still perform a significant number of jobs available in the national economy. This included light jobs such as mail sorter, labeler, and photocopy machine operator. *Id*. at 52. His ability to perform such

6

jobs meant that he was not under a benefits-qualifying disability, in the ALJ's view. *Id.* at 52-53.

IV.  **Judicial Review**

The Social Security Administration's denial of Plaintiff's applications for benefits is subject to judicial review along two lines: whether ALJ Hockensmith applied the correct legal standards and whether substantial evidence supports his findings. *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see Bowen v. Comm'r of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Reviewing the ALJ's legal criteria for correctness may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. Substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, substantial evidence supports the ALJ's factual findings when a "'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

V.  **Discussion**

Plaintiff contends that the ALJ's assessment of his residual functional capacity

7

fails to reasonably reflect the limitations caused by his well-documented lower-leg injuries. He reasons, in part, "The idea that Plaintiff has either no meaningful limitations whatsoever in weight-bearing activities or that he can spend a full two-thirds of every workday ascending stairs appears inconsistent with even ALJ Hockensmith's own summation of the record's evidence." (Doc. #7, *PageID* #740 (citing *PageID* #s 46-49)). Plaintiff also argues that the ALJ unreasonably and erroneously relied on the DDD physician's—Dr. Onamusi's—opinions.

The Commissioner argues that the ALJ properly assigned moderate weight to the DDD record-reviewing physicians' and Dr. Onamusi's opinions that Plaintiff could perform light work with certain limitations. The Commissioner reasons that the ALJ (1) adequately analyzed the applicable regulatory factors; (2) acknowledged that the opinions were from "DDD reviewing physicians"; (3) considered the "consistency" factor; (4) extensively and accurately described the substantial evidence supporting his view of Plaintiff's "generally unremarkable" x-rays.

Social security regulations provide "progressively more rigorous tests for weighing opinions…," provided by a physician, "as the ties between the source of the opinion and the individual become weaker.' " *Gayheart v. Comm'r of Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (quoting Soc. Sec. R. 96–6p, 1996 WL 374180, at *2 (July 2, 1996)). For example, nontreating source opinions "are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources." Soc. Sec. R. 96–6p, 1996 WL 374180, at *2.

To determine how much credit to give nontreating sources, ALJs must weigh their "opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling." *Gayheart*, 710 F.3d at 375 (citing 20 C.F.R. § 404.1527(c)). "Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion. *Id.* (quoting § 404.1527(c)(6)).

The ALJ also weighed the opinions of one-time DDD consultative physician Dr. Onamusi. The ALJ reported:

> Based on [his] evaluation, Dr. Onamusi opined that the claimant was capable of functioning at a sedentary to light physical demand level. I give moderate weight to the opinions of the DDD consulting physician, to the extent that his assessment is consistent with [a] limitation to light work.

*Id.* at 50 (footnote added).

Error of Law: The ALJ erred as a matter of law by first assessing Plaintiff's residual functional capacity (for limited light work), then using that assessment to weigh, and place moderate weight on, Dr. Onamusi's opinions. This reverses the required analysis. Under Social Security regulations, medical evidence—including physicians' opinions—informs the ALJ's assessment of a claimant's residual functional capacity. 20 C.F.R. § 404.1545(a)(3) ("We will consider any statements about what you can still do that have been provided by medical sources …."); *see also* Soc. Sec. R. 96-8p, 1996 WL 374184, *7 (July 2, 1996) ("The [residual functional capacity] assessment must always consider and address medical source opinions…."); *Moruzzi v. Comm'r of Soc. Security*, No. 18-3320, 2018 WL 6721346, at *8 (6th Cir. 2018) ("In formulating a residual functional capacity, the ALJ evaluates all relevant medical and other evidence and

9

considers what weight to assign to treating, consultative, and examining physicians' opinions."). The ALJ's assessment of a claimant's residual functional capacity plays no role in weighing physicians' opinions. Indeed, the factors pertinent to medical-opinion weighing omit mention of a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1527(c) (describing relevant weighing factors without mentioning residual functional capacity); *see also* Soc. Sec. R. 96-6p, 1996 WL 374180 (July 2, 1996) (same). The ALJ's reversed reasoning applied incorrect legal criteria to weigh Dr. Onamusi's opinion.

<u>Unsupported Findings</u>: The ALJ, however, declined to limit Plaintiff to sedentary work by relying on some of Plaintiff's self-reported daily activities. The ALJ explained that throughout the record and during his testimony, Plaintiff "reports … performing daily activities, such as mowing the lawn, carrying bags of salt down the basement stairs, going for two to three mile walks, and caring for his elderly mother. Additionally, mild findings on diagnostic testing, including x-rays and EMG, do not support limitation to sedentary work." (Doc. #6, *PageID* #60). *Id.* For these reasons, the ALJ declined to credit Dr. Onamusi's opinion that Plaintiff could perform the lower range—sedentary work—of sedentary to light work.

The ALJ took a similar approach to weighing, and placing "moderate weight" on, the opinions provided by record-reviewing physicians Dr. Amiri and Dr. Hughes. The ALJ reported:

> Dr. Amiri opined that the claimant was capable of light work with occasional climbing of ladders, ropes or scaffolds; frequent climbing of ramps or stairs, kneeling, and crouching; and occasional crawling. [Dr.] Hughes…, also reviewed the evidence…, and affirmed Dr. Amiri's assessment (Exhibits 5A and 6A)…. Limiting claimant to a reduced range of light work is consistent with his relatively conservative treatment

10

> history, generally unremarkable findings in x-rays of the bilateral lower extremities, and an EMG report showing only mild peripheral neuropathy. However, more weight cannot be given because I have given weight to the claimant's subjective reports of ongoing pain in his right leg and have further limited him to only occasional pushing/pulling with right lower extremity.

(Doc. #6, *PageID* #s 49-50).

Substantial evidence does not support these reasons. The ALJ unreasonably describes the medical evidence as showing that Plaintiff had "relatively conservative treatment." Plaintiff's allegations of disabling pain rest upon a foundation of not only reconstructive surgery with the implantation of hardware in both of his lower extremities— including screws inserted into bone—but also subsequent surgery to remove the hardware in his ankle when it failed. *See* Doc. #6, PageID #s 375-77, 548-51. Following the removal surgery, Plaintiff's course of treatment involved not only consultations with his primary care provider and batteries of diagnostic testing, but also physical therapy, prescriptions for heavy duty pain killers (like Hydrocodone), and an extended course of treatment with a pain-management specialist. The ALJ's characterization of such extensive treatment as "conservative" is unreasonable. Additionally, the ALJ misused the phrase, "relatively conservative," to diminish the seriousness of Plaintiff's medical treatment. The phrase "relatively conservative" without further explanation—which the ALJ did not provide—is a euphemism for "not serious." The record does not support this in view of the initial seriousness of his injuries, the invasive surgery required to repair his lower extremities, the presence of surgical hardware in his lower extremities (some of which failed), ineffective treatment(including physical therapy), and the need for treatment with Hydrocodone and

other prescription medications. In these circumstances, even so-called conservative treatment aggravated Plaintiff's condition. Initial improvements were noted, for example, after physical therapy, but physical therapy also aggravated his swelling and pain, thus providing him with only a temporary reduction in his symptoms. Similarly, his prescribed narcotic medication (*e.g.*, Hydrocodone) provided him with only temporary-symptom relief. Because the ALJ credited the opinions of Drs. Amiri and Hughes without addressing these aspects of Plaintiff's treatment, substantial evidence does not support his characterization of Plaintiff's treatment as "relatively conservative." *Cf. Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) ("A finding of substantial evidence must be 'based on the record as a whole' and must "take into account whatever in the record fairly detracts from its weight." (citations omitted)); *Brooks v. Comm'r of Social Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) ("a substantiality of evidence evaluation does not permit a selective reading of the record." (citations omitted)).

    Additionally, substantial evidence does not support the ALJ's conclusion that "generally unremarkable findings in x-rays of the bilateral lower extremities" merited the ALJ's decision to accept the opinions of Drs. Onamusi and Amiri. (Doc. #7, *PageID* #50). Rather than being "generally unremarkable," imaging of Plaintiff's left foot, even well after his 2013 surgery, revealed a metallic density, a bone-screw-hole defect surrounded by post-traumatic cystic changes, hypertrophic calcification along Plaintiff's tibia, and some soft tissue swelling. *Id*. at 466. The ALJ improperly overlooked these aspects of Plaintiff's imaging while making his "generally unremarkable" finding. And, the ALJ improperly assumed the role of medical expert by applying his own lay

12

interpretation of the medical-imaging results to support his conclusion that "generally unremarkable." *Cf. Simpson v. Comm. of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (citing, in part, *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings[.]")).

ALJ Hockensmith also errs in finding that Dr. Amiri's and Dr. Hughes' opinions merited reliance because Plaintiff's January 2016 EMG showed only mild neuropathy. (Doc. #7, *PageID* #50; *see PageID* #620). Yet, these physicians engaged in a limited consideration of Plaintiff's constant, ongoing orthopedic symptoms caused by his lower-extremity trauma and his resulting invasive surgeries, and they did not discuss, or indicate that they considered combination of these problems with Plaintiff's mild neuropathy. *See PageID* #s 100-01, 127-28. Further, Plaintiff does not allege disabling limitations secondary to lower-extremity neuropathy, but due to his persistently worsening residuals caused by the severe trauma he suffered in his lower extremities, his resulting invasive surgeries, and the failure of his 2013 surgery to ameliorate his left-ankle pain and swelling. *See id*. at 70-80. Consequently, it was unreasonable to rely on Plaintiff's EMG test results to credit these physicians' opinions.

Returning to Dr. Onamusi's opinion that Plaintiff could perform a range of sedentary to light work, the ALJ agreed that Plaintiff could perform sedentary work based on his lack of credibility. The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record …." *Id*. at 46. To the extent

13

the ALJ required Plaintiff's statements regarding his symptoms to be consistent with all the medical evidence and other evidence, the ALJ erred. Although the "consistency" of an individual's self-described symptoms with other evidence is a "strong indication of … credibility…," Soc. Sec. R. 96-7p, 1996 WL 374186, *5 (July 2, 1996), the regulations require a comparative analysis of the evidence to discover "the extent to which [the individual's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence…." 20 C.F.R. § 404.1529(a).

Even if the ALJ did not err in this manner, substantial evidence does not support his assessment of Plaintiff's credibility or his conclusion that Plaintiff is not limited to sedentary work.

"[A]n ALJ's findings based on the credibility of the applicant are … accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y of Health & Human Servs.,* 818 F.2d 461, 463 (6th Cir. 1987)); *see Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 542 (6th Cir. 2007). Still, substantial evidence must support an ALJ's credibility assessment. *Cruse,* 502 F.3d at 542 (citing *Walters,* 127 F.3d at 531).

The ALJ explained that limiting Plaintiff "to sedentary work is not warranted given his reports throughout the record and at [the] hearing of performing activities of daily living such as mowing the lawn, carrying bags of salt down the basement stairs, going for two to three mile walks, and caring for his elderly mother…." *Id*. at 50. The ALJ observed:

14

> [Plaintiff's] treatment records show that he reported mowing lawns throughout physical therapy and that he was able to carry bags of salt down the stairs. At [the] hearing, he indicated that he had not been able to mow lawns for two to three years and had thrown bags of salt down the stairs, but these reports are not consistent with his progress notes. He also indicated that he was walking two to three miles at a time. The performance of such activities on a regular and continuing basis indicates that the claimant remains capable of performing work involving the above-described reduced range of light exertion with no climbing of ladders, ropes or scaffolds and only frequent climbing of ramps or stairs. He is also capable of frequent kneeling and crouching; occasional crawling; and occasional pushing/pulling with the right lower extremity [sic].

(Doc. #7, *PageID* #49).

The ALJ's attempt to contrast Plaintiff's testimony about his ability to sit or drive for extended periods with his ability, at one time, to care for his elderly mother overlooks significant details in his testimony. But, Plaintiff explained to the ALJ that "at the end, she [his mother] was falling a lot … and she had a walker, so I would always help her…, try to get upon [sic] or get her close to a chair, to where she could…, between the chair and myself, get her up." (Doc. #7, *PageID* #67). He would bring clothes to her but did not help her change clothes (she could still change clothes by herself). Plaintiff would do laundry but fell once taking it down the basement stairs. He consequently did this by taking one step at a time, favoring his left leg so his right leg—with its pins and metal plates—would not bear the load. *Id*. at 69. He would also throw the basket of laundry downstairs. He further testified, "any days that I did laundry, by the time I was done, my day was shot for the rest of the day because I'd have to go [lie] down with a heating pad." *Id*. at 81. Plaintiff tried to go for walks, but afterward, "it was bad. I was six and eight Tylenol a day." *Id*. at 76. He never carried a bag of salt down the stairs; he would roll them down. *Id.* At the time of the ALJ's hearing, he had not mowed the lawn for 2 to 3

15

years and only used a weed-eater occasionally for a little bit. *Id*. The ALJ did not ask Plaintiff about how long or how often he could engage in lawn mowing. And Plaintiff testified that he used a self-propelled mower. *Id*. When Plaintiff cooked for his mother, he did not make big meals. He instead made simple meals, so he wouldn't have to be up for long periods of time. *Id*. at 81. In light of this evidence, which the ALJ overlooked or ignored, Plaintiff's daily activities do not reasonably support the ALJ's finding that Plaintiff could perform these activities on a regular and sustained basis as required to sustain either sedentary or light work. *See* Soc. Sec. R. 96-6p, 1996 WL 374184, *2 (a person's residual functional capacity is his or her maximum ability to perform sustained work activities in a work setting on a regular and continuing basis, meaning 8 hours a day, 5 days a week, or an equivalent schedule.).

      The ALJ also unreasonably contrasts Plaintiff's testimony regarding his activities with the contents of his physical-therapy progress notes. For instance, notes from July 2014 indicating that Plaintiff had increased knee pain after attempting to mow. These notes are not inconsistent with his testimony that, as of November 2016, he had not mowed in two or three years. *See* Doc. #7, *PageID* #s 76, 437-41. Attempting to mow, says nothing about how long he attempted to mow, or whether he was at all successful in his attempt. Similarly, Plaintiff's July 2014 report that he had "overdone it" by attempting to walk two-to-three miles one time is consistent with his explanation that he is unable to walk long distances without significantly exacerbating his symptoms. *See id*. at 441 ("increased R knee pain due to extended walking").

      The ALJ also finds that Plaintiff was not fully credible because he reported to his

16

pain-management physician on one occasion that he does not always take his Hydrocodone. *See id*. at 49 (citing *PageID* #729). As explained in the cited treatment note, *id*. at 729, Plaintiff elects not to take Hydrocodone when the weather is nice (because his pain levels are typically lower) or if he is going to drive (because the medication is sedating). This treatment note fails to reasonably support the conclusion that he stopped or temporarily stopped taking his medication because he had low levels of pain.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.

## VI. Remand for Benefits

Remand is warranted when an ALJ's decision is unsupported by substantial evidence or when an ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand due to an ALJ's failure to follow the regulations might arise, for example, when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff's credibility lacking, *Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently,

17

a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted "only where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking." *Felisky*, 35 F.3d at 1041 (quoting *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994) ).

In the present case, the evidence of record establishes that a remand for award of benefits is warranted because the record contains strong evidence while contrary evidence is lacking. Plaintiff suffered well-documented traumatic injuries from a car accident. His injuries required invasive surgery involving the implantation of surgical hardware into his left ankle and right leg, including bone screws. The surgical hardware in his left ankle later failed, leaving an open bone-screw hole. When Plaintiff concluded that he had recovered from his initial surgery, he attempted to work and did so successfully until his surgical-hardware problem. His ability to work during this short period of time tends to show that he wanted to work despite his serious ankle and leg problems. Plaintiff also attempted to recover, or at least improve his serious pain levels, by undergoing treatment in different modalities (e.g., prescribed medications, physical therapy). These facts—which the ALJ did not address—tend to enhance Plaintiff's credibility concerning the ongoing pain and swelling he suffers. Although ALJ credibility determinations are generally due great deference, such deference is not due here because the ALJ failed to explain the significantly probative evidence favoring Plaintiff's credibility.

Accordingly, in light of the strong evidence of Plaintiff's disability and the weak contrary evidence, the ALJ's decision is subject to reversal, and this matter should be returned to the Social Security Administration for payment of benefits.

### IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be reversed;

2. The case be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for payment of benefits;

3. The case be terminated on the docket of this Court.

April 30, 2019　　　　　　　　　　　　　*s/Sharon L. Ovington*
　　　　　　　　　　　　　　　　　　　　Sharon L. Ovington
　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).